UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 24 CR 452 |
| v. | ) | |
| | ) | Judge Steven C. Seeger |
| JOSEPH DONELSON | ) | |

# GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Joseph DONELSON, is being sentenced for four bank robberies that he committed or attempted, all within a two month period. He committed this spree of robberies just a few months after commencing supervised release for a prior federal conviction for multiple bank robberies. During one of the robberies in this case, defendant leaped onto the counter in attempt to take money from a teller station by force. During another robbery, defendant caused lasting trauma to the bank teller from whom he stole. During yet another, defendant struck a bank teller in the face. The defendant is now being sentenced for his third bank robbery conviction in federal court. Defendant's staggering criminal history and the aggravating nature of his conduct warrant a sentence above the advisory Guidelines range. Accordingly, the government recommends a sentence of 240 months imprisonment, a three-year term of supervised release, and $20,739.29 in total restitution.

## I. Factual Background

### A. Count Two

On October 11, 2023, defendant attempted a robbery at the Citibank located at 180 North Michigan Avenue. PSR ¶ 10. During the attempt, defendant jumped up onto the teller counter and reached for the teller drawer. *Id.* At trial, the bank teller

testified that no one had ever jumped on her teller counter before or after this incident, and that it was scary for her. *Id.*

**B. Count Three**

On November 7, 2023, defendant went back to 180 North Michigan Avenue, and this time succeeded in robbing Citibank. PSR¶ 11. Defendant approached the teller counter and told the bank teller (Victim Teller C.R.) to "give me money, bitch" and "give me 100s." *Id.* Defendant also pointed a gun-like object at Victim Teller C.R. *Id.* In response, Victim Teller C.R., who believed the gun was real, gave defendant $9,161 from her teller drawer. *Id.* At trial, Victim Teller C.R. testified that she "was sure" the defendant would kill her if she did not comply. *Id.* As a result of this encounter, the teller has experienced significant trauma, stopped going to work within weeks of the robbery, and has been diagnosed with PTSD. *Id.*; Suppl. GVO, Ex. B at 000008.

**C. Count Four**

On December 8, 2023, defendant robbed the Citibank branch located at 539 North Michigan Avenue. PSR ¶ 12. Defendant approached the teller counter, partially pulled out a gun-like object from his jacket, and said words to the effect of "Give me all your 100's, 50's, and 20's." *Id.* In response, the bank teller gave him $4,650 from her teller drawer. *Id.* After the defendant left the bank, the teller hid underneath her teller station because she was scared and did not want anyone to see her in that state. *Id.*

**D. Count Five**

On December 19, 2023, defendant attempted to rob the Citibank at 100 S. Michigan Avenue. PSR ¶ 13. Defendant approached the teller counter and told the bank teller words to the effect of "Give me 50's and 100's. Give me the money." *Id.* Defendant pulled out a gun-like object, called the teller a "bitch," struck the teller across the face with the gun-like object, and reached across the teller counter to try and access the teller drawer. *Id.* At trial, the teller testified that she was both mad and scared during this experience, and that defendant's strike to her face was painful and made her face red. *Id.*

Defendant committed these robberies while he was on supervised release in this district for a prior bank robbery conviction in Case No. 7 CR 43. PSR ¶ 70.

## II. Procedural Background

On December 30, 2023, defendant was arrested by the Chicago Police Department on a supervised release violation in the 7 CR 43 case. PSR at 1-2. On September 25, 2024, a grand jury returned an indictment charging Joseph Donelson with five counts of bank robbery in violation of 18 U.S.C. § 2113(a). Dkt. 1. On April 13, 2026, this case went to trial and on April 22, 2026, the jury returned a verdict of guilty on Counts Two through Five of the indictment, and a verdict of not guilty on Count One of the indictment. Dkt. 80, 112

## III. Sentencing Guidelines Calculations

### A. Offense Level

The government agrees with the Probation Officer's offense level calculation. *See* PSR ¶¶ 20-56. More specifically, the offense level is determined as follows:

**1. Count Two**

The base offense level is 20, pursuant to Guideline § 2B3.1(a). Pursuant to Guideline § 2B3.1(b)(1), the offense level is increased by two levels because taking of property from a financial institution was the object of the offense. Therefore, the adjusted offense level for Count Two is 22.

**2. Count Three**

The base offense level is 20, pursuant to Guideline § 2B3.1(a). Pursuant to Guideline § 2B3.1(b)(1), the offense level is increased by 2 levels because the property of a financial institution was taken. Pursuant to Guideline § 2B3.1(b)(2)(D), the offense level is increased by 4 levels, because a dangerous weapon was otherwise used.[1] [2] Therefore, the adjusted offense level for Count Three is 26.

**3. Count Four**

The base offense level is 20, pursuant to Guideline § 2B3.1(a). Pursuant to Guideline § 2B3.1(b)(1), the offense level is increased by 2 levels because the property of a financial institution was taken. Pursuant to Guideline § 2B3.1(b)(2)(E), the

---

[1] "Dangerous weapon" means (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g., a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun). Guideline § 1B1.1, Application Note 1(E).

[2] "Otherwise used" with reference to a dangerous weapon (including a firearm) means that the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon. Guideline § 1B1.1, Application Note 1(I). This includes pointing a weapon at a specific individual. *United States v. Eubanks*, 593 F.3d 645, 651 (7th Cir. 2010); *United States v. Warren*, 279 F.3d 561, 563 (7th Cir. 2002).

offense level is increased by 3 levels, because a dangerous weapon was brandished or possessed.[3] Therefore, the adjusted offense level for Count Four is 25.

**4. Count Five**

The base offense level is 20, pursuant to Guideline § 2B3.1(a). Pursuant to Guideline § 2B3.1(b)(1), the offense level is increased by 2 levels because taking of property from a financial institution was the object of the offense. Pursuant to Guideline § 2B3.1(b)(2)(d), the offense level is increased by 4 levels, because a dangerous weapon was otherwise used. Pursuant to § 2B3.1(b)(3)(A), the offense is increased by two levels because a victim sustained bodily injury.[4] Therefore, the adjusted offense level for Count Five is 28.

**5. Grouping**

Pursuant to Guideline § 3D1.2, the counts of conviction do not group. Pursuant to Guideline § 3D1.4, Count Five, which has an adjusted offense level of 28, counts as one unit. Counts Three and Four each count as an additional unit because they are

[3] "Brandished" with reference to a dangerous weapon (including a firearm) means that all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person. Accordingly, although the dangerous weapon does not have to be directly visible, the weapon must be present. Guideline § 1B1.1, Application Note 1(C).

[4] "Bodily injury" means any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought. Guideline § 1B1.1, Application Note 1(B). Courts have found that "painful and obvious" injuries constitute "bodily injuries" even if the victim does not seek medical attention. *United States v. Hamm*, 13 F.3d 1126, 1128 (7th Cir. 1994); *see also United States v. Fitzwater*, 896 F.2d 1009, 1012 (6th Cir. 1990) (two point enhancement for bodily injury applied where teller hit his head and hip on teller station when she got down on the floor); *United States v. Maiden*, 606 F.3d 337, 338 (7th Cir. 2010) (two point enhancement for bodily injury applied where victim stated that following being pepper-sprayed by defendant, victim felt burning sensation whenever she attempted to wear contact lenses); *United States v. Isaacs*, 947 F.2d 112, 114 (4th Cir. 1991) (strike to victim's face warranted two-point enhancement where, despite victim's testimony that blow was not painful, other witnesses observed that victim's face appeared red, puffy, and victim related that their ear was ringing).

from one to four levels less serious than Count Five. Count Two counts as an additional one-half unit because it is five to eight levels less serious than Count Five. Pursuant to Guideline § 3D1.4, because there are three and one-half units, four levels are added. Therefore, the total combined offense level is 32.

### B. Criminal History Category

The government agrees with the criminal history category calculations set forth in the PSR. *See* PSR ¶¶ 58-71. Although defendant's criminal history includes several convictions that do not receive criminal history points pursuant to Guideline § 4A1.2(e)(3), PSR ¶¶ 63-69 the following convictions do receive criminal history points.

On or about July 29, 2008, defendant was convicted of two counts of bank robbery in the United States District Court for the Northern District of Illinois and sentenced to 240 months of imprisonment. Pursuant to Guideline § 4A1.1(a), defendant receives 3 criminal history points for this sentence. Furthermore, pursuant to Guideline § 4A1.1(d), defendant receives 1 additional criminal history points for a total of 4 history points.

### C. Advisory Guideline Range

The government agrees with the advisory Guideline range set forth in the PSR. An offense level of 32 combined with a criminal history category of III results in an advisory sentencing guidelines range of 151 to 188 months' imprisonment in addition to any supervised release, fine, and restitution the Court may impose. PSR ¶ 114.

## IV. Application of the Statutory Sentencing Factors

Sentencing has four purposes: retribution, deterrence, incapacitation, and rehabilitation. *United States v. Milbourn*, 600 F.3d 808, 812 (7th Cir. 2010). The Court must impose a sentence that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553(a). In doing so, the Court must consider the statutory factors outlined in 18 U.S.C. § 3553(a)(1)-(7), including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; [and] (3) the kinds of sentences available.

*Id.* § 3553(a)(1)-(3). The Court must also respect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," as well as "the need to provide restitution to any victim of the offense." *Id.* § 3553(a)(6)-(7). Finally, the Court must consider the Guideline range and any pertinent policy statements issued by the United States Sentencing Commission. *Id.* § 3553(a)(4)-(5). Although the Sentencing Guidelines are only advisory, "[a]s a matter of administration and to secure nationwide consistency, [they] should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007).

For the following reasons, the government requests that this Court impose an above-guidelines sentence of 240 months' imprisonment, $20,739.29 in total restitution, and a supervised release term of three years. Considering the § 3553(a)

factors, that is sufficient but not greater than necessary to protect the public, promote respect for the law, provide just punishment, and afford adequate deterrence, while also considering the nature and circumstances of the offense and defendant's history and characteristics.

### A. Imprisonment

#### 1. An Above Guidelines Sentence of Imprisonment Accurately Reflects the Nature and Seriousness of the Offense and the Need for Just Punishment

"[B]ank robbery is a very serious crime." *United States v. Roberson*, 474 F.3d 432, 435 (7th Cir. 2007). By definition, violations of 18 U.S.C. § 2113(a) involve the use of force, violence, or intimidation. It is unsurprising, therefore, that the offense constitutes both a "crime of violence" in the context of career offenders, *see, e.g.*, *United States v. Campbell*, 865 F.3d 853, 854 (7th Cir. 2017), as well as a "violent felony" under the Armed Career Criminal Act. *United States v. Evans*, 924 F.3d 21, 31 (2d Cir. 2019).

Defendant's actions terrorized multiple bank employees, causing injury to one, and lasting psychological trauma to another. Over time, defendant's conduct escalated. During the October 11, 2023 attempted bank robbery, defendant leaped onto the counter in a brazen attempt to take money by force. During the November 7, 2023 and December 8, 2023 bank robberies, defendant brandished a gun-like object to threaten bank tellers. And on December 19, 2023, defendant struck the victim teller in the face with a gun-like object. Defendant also stole property belonging to a federally insured bank and disrupted the safe, orderly functioning of a community institution upon which citizens regularly depend. Therefore, defendant's sentence

must accurately reflect the gravity of his misconduct and protect the public from its future occurrence.

Defendant also robbed these banks while on supervised release for a prior federal bank robbery conviction for which he still owes $16,678 in restitution. PSR ¶¶ 70. And in fact, he committed *that* offense while on supervised release for an earlier federal bank robbery conviction. PSR ¶ 69. His crimes demonstrated utter disrespect for the law and a severe sentence is necessary as just punishment.

**2. An Above Guidelines Sentence of Imprisonment Accurately Reflects Defendant's History and Characteristics**

Defendant receives four criminal points and is a criminal history category of III. Although that calculation is correct under the sentencing guidelines, it severely understates the severity of defendant's aggravating criminal history.

Although defendant does not qualify as a career offender for purposes of the sentencing guidelines, he is a "career offender" in any common-sense, intuitive understanding of the term. Defendant is a serial bank robber, plain and simple. It is not an exaggeration to describe defendant's entire adult life as an unbroken cycle of committing a crime violence shortly after being paroled for a prior crime of violence. Defendant has now been tried and convicted for a third time of a string of bank robberies in this district. PSR ¶¶ 69-70. This is also the second consecutive time that defendant has committed multiple bank robberies while on federal supervised release for a prior bank robbery conviction in this district. *Id.* With his convictions in this case, within this district court alone, a jury of his peers has now found defendant guilty of his eighth, ninth, tenth, and eleventh bank robberies. *Id.* For the two prior

federal bank robbery convictions, defendant received lengthy sentences of 236 months, and 240 months, respectively. *Id.*

Defendant has a history of substance abuse and reports that when defendant was released from custody in 2023, and until his arrest for the instant offense, defendant used cocaine every day. PSR ¶ 101. Defendant also reports having used heroin a few times a month. *Id.* This is both a mitigating and aggravating factor. Although it does not summarily excuse defendant from being held accountable for a serious offense, it is reasonable to partially (although not completely) attribute defendant's criminal conduct to the service of his addiction. On the other hand, when criminal conduct is tied to an addiction, this enhances the risk of recidivism. On balance, defendant's staggering criminal history far outweighs any mitigation presented in defendant's background. Accordingly, defendant's history and characteristics support an above-guidelines sentence.

### 3. The Need for Adequate Deterrence

A significant term of imprisonment is necessary to deter defendants with extensive criminal history from engaging in crimes of violence. Crimes of violence consume substantial prosecutorial resources each year. Of the 63,954 criminal cases filed in U.S. district courts in fiscal year 2025, 12,754 (19.9%) involved violent crime.[5] Bank robberies traditionally compose a significant portion of this caseload. In calendar year 2023 alone, the FBI documented 1,362 violations of Title 18, United

[5] U.S. Department of Justice, *United States Attorneys' Annual Statistical Report, Fiscal Year 2025* at 12, http://www.justice.gov/usao/media/1399686/dl?inline. (last visited July 15, 2026).

States Code, Section 2113, of which 1,112 were commercial bank robberies.[6] Of the 1,362 violations of Section 2113 in 2023, 1,182 involved the counter area of the financial institution and 539 involved the threatened use of a weapon.[7] That year, Illinois accounted for 116 of nationwide Section 2113 violations, the second most out of all states.[8] *See United States v. Severino-Pacheco*, 911 F.3d 14, 22 (1st Cir. 2018) ("Community-based considerations are inextricably intertwined with deterrence ... [and] the incidence of particular crimes in the relevant community appropriately informs and contextualizes the relevant need for deterrence." (quoting *United States v. Flores-Machicote*, 706 F.3d 16, 21 (1st Cir. 2013) (alterations in original)). Robberies of commercial banks, much like defendant's instant offense, are an all-too regular occurrence. The sentence in this case must deter the occurrence of these offenses in the community.

Given defendant's history of repeated bank robberies, a severe sentence is clearly necessary to deter the defendant from further bank robberies. Defendant is at high-risk of recidivism and a lengthy sentence is required to achieve specific deterrence. Notably, prior lengthy prison sentences for federal bank robbery convictions (each approximately 20 years in length) failed to achieve such deterrence. PSR ¶¶ 69-70. At this stage in defendant's life, however, his advanced age should

---

[6] Federal Bureau of Investigation, *Bank Crime Statistics 2023* at 1, https://www.fbi.gov/file-repository/bank-crime-statistics-2023-091724.pdf/view. (last visited July 15, 2026). It does not appear that the FBI issued this report for any year beyond 2023.

[7] *Id.* at 2, 4.

[8] *Id.* at 7.

enhance the deterrence impact of a sentence that approximates defendant's two prior federal sentences.

**4. The Need to Avoid Unwarranted Sentencing Disparities**

The imposition of a sentence within defendant's advisory Guidelines range will also assist in ensuring the goals of fair and uniform sentencing. *See Gall v. United States*, 522 U.S. 38, 49 (2007) ("As a matter of administration and to ensure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). Probation recommends and the government also seeks a sentence above the Guidelines range, which takes into account appropriate consideration of aggravating factors. The government's recommended sentence thus provides appropriate punishment for defendant, a recidivist bank robber whose criminal history category is severely understated.

Based on defendant's longstanding history of reoffending, defendant is fortunate that only one of one of his prior convictions receive criminal history points. In fact, based on his criminal history, the primary reason why defendant does not receive more criminal history points (and is not a career offender) under the guidelines is defendant's lengthy incapacitation between bank robberies, not his intervening repudiation of criminal conduct.[9]

[9] Assuming, for the sake of argument, that defendant also received criminal history points for the 1990 federal bank robbery conviction, PSR ¶ 69, defendant would be a career offender under Guideline § 4B1.1(a). By the government's calculation, under Guideline § 4B1.1(b)(3), defendant's Guideline Range would be 210 to 262 months based on an offense level of 32 and criminal history category of VI.

### 5. Victim Impact

On October 11, 2023, defendant leaped onto the teller counter and thrust himself into a victim teller's personal space. PSR ¶ 10. On November 7, 2023, defendant pointed a gun-like object at Victim Teller C.R. who now suffers from PTSD from the robbery.[10] *Id.* ¶ 11. As a result, she left her job with Citibank and has spent thousands of dollars to treat the debilitating symptoms caused by the lasting trauma defendant inflicted. Suppl. GVO, Ex. B at 000008. On December 8, 2023, defendant brandished a gun-like object when robbing another bank teller who, after the robbery, then hid under her desk. PSR ¶ 11. And on December 19, 2023, defendant hit a fourth bank teller in the face with a gun like object, inflicting both pain and fear. PSR ¶ 12. Defendant's crimes have had lasting detrimental impact on victims, and his sentence must be severe.

## B. Supervised Release

The government recommends a three-year term of supervised release, with the mandatory, discretionary, and special conditions recommended by the Probation Office (with certain exceptions summarized below), as they will facilitate supervision, support defendant's rehabilitation and reintegration into the community, provide additional deterrence from future crimes, and help ensure he is engaged in lawful pursuits upon release. *See* PSR at 27-34.

Should defendant receive a sentence approximating what both the government and the Probation office recommends, defendant will be approaching 90 years old

[10] Victim Teller C.R.'s victim impact statement, and supporting documentation regarding her PTSD diagnosis and treatment, are attached as Exhibit B to the Government's Supplemental GVO.

when he is released. As a result, in the government's view, it is impractical to impose Discretionary Condition # 4 (work full time) and Special Condition # 3 (20 hours of weekly community service if unemployed for 60 days).

### C. Fine

The government agrees with Probation's recommendation not to impose a fine in this case.

### D. Restitution

#### 1. Citibank

Defendant owes, in total, $13,811 in restitution to Citibank for $9,161 he stole from Citibank during the November 7, 2023 robbery, and $4,650 he stole from Citibank during the December 8, 2023 robbery.

#### 2. Victim Teller C.R.

The government also recommends that the Court impose restitution owed to Victim Teller C.R., who was directly harmed by defendant's commission of the November 7, 2023 armed robbery. As a result of trauma caused by the November 7, 2023 armed robbery, Victim Teller C.R. was diagnosed with PTSD, Suppl. GVO, Ex. B at 000008, left her job at Citibank shortly after the robbery, PSR ¶ 11, and has been receiving treatment for a number of PTSD-induced symptoms. Suppl. GVO, Ex. B.

Defendant is convicted of crimes of violence which subject him to restitution under the Mandatory Victims Restitution Act. 18 U.S.C. § 3663A(c)(1)(A)(i). Under the plain language of the MVRA, restitution includes reimbursement for psychiatric treatment where victims suffer "bodily injury". 18 U.S.C. § 3663A(b)(2)(A) (defendant must "pay an amount equal to the cost of necessary medical and related professional

services ... relating to physical, psychiatric, and psychological care, including nonmedical care and treatment”). Despite the MVRA’s reference to “bodily injury,” courts have imposed restitution for psychiatric care that is not tied to physical injuries. *See, e.g., United States v. Breshers*, 684 F.3d 699, 703 (7th Cir. 2012) (district court did not plainly err in ordering restitution for victim’s psychiatric care despite no manifestation of physical injury); *United States v. Keelan*, 786 F.3d 865, 872 (11th Cir. 2015) (“The [MVRA] statute explicitly encompasses mental health treatment necessary to treat the psychological trauma of the victim.”). The MVRA does not define “bodily injury,” but in other contexts, federal law includes mental injury in the definition of bodily injury. *See Breshers*, 684 F.3d at 702 (collecting statutes); 18 U.S.C. § 1365(g)(1)(B)(3) (defining “bodily injury” as including “impairment of the function of a bodily member, organ, or mental faculty”); U.S.S.G. § 1B1.1, comment. (j) (defining “serious bodily injury” as including impairment of a “function of a bodily member, organ, or mental faculty”); 18 U.S.C.A. § 1515(5)(D) (same).

Specifically, Victim Teller C.R. seeks restitution for (1) the cost of treatment for PTSD caused by the armed robbery; (2) the increase in out-of-pocket health insurance premiums due to her leaving Citibank because of trauma suffered by the armed robber; and (3) the cost of medication prescribed to treat said trauma. For the reasons explained above, the MVRA contemplates restitution to Victim Teller C.R. reimbursing her for the cost of psychiatric treatment for her PTSD, which was caused directly by defendant’s bank robbery on November 7, 2023.

As to the cost of treatment and medication, the documentation submitted in support of Victim Tellers C.R.'s victim impact statement supports $6,928.98 in restitution, as summarized below.[11]

*Cost of Treatment*:

| Provider | Purpose | Dates of Service | Victim Cost | Supporting Documentation |
|---|---|---|---|---|
| Amber Bard, MD | Psychotherapy | 4/22/24 – 3/31/26 | $619.38 | Suppl. GVO, Ex. B at 000014-18 |
| Adriana Konar, LCPC | Psychotherapy | 1/22/24 – 6/28/25 | $2,207.85 | Suppl. GVO, Ex. B at 000029-56 |
| Ana Gavrilovici, MD | Psychotherapy | 6/12/24 – 7/18/25 | $636.23 | Suppl. GVO, Ex. B at 000057-77 |
| Kate Paluszek, LCPC | PTSD evaluation and psychotherapy | 12/7/23 – 12/14/23 | $ 545.16 | Suppl. GVO, Ex. B at 000012 |
| Joya Paul, MD | Sleep study for insomnia[12] | 2/4/25 | $1,358.00 | Suppl. GVO, Ex. B at 000079 |
| Endeavor Health | Hospitalization for migraines[13] | 3/18/26 | $1053.59 | Suppl. GVO, Ex. B at 000078 |
| *Total* | | | $6,420.18 | |

*Medication*

As part of her victim impact statement, Victim Teller C.R. provided documentation support out-of-pocket costs for prescription medication prescribed by one or more of the providers listed above. Suppl. GVO, Ex. B at 000084-110. By the

[11] Attached as Exhibit C to the Government's Supplemental GVO is the government's calculation of Victim Teller C.R.'s out-of-pocket payments for treatment, based on its review of records Victim Teller C.R. provided in support of her victim impact statement.

[12] Medical providers identified insomnia as one of the observed symptoms of Victim Teller C.R.'s PTSD. Suppl. GVO, Ex. B. at 000008, 000010, 000015-16, 000063.

[13] Medical providers also identified migraines as one of the observed symptoms Victim Teller C.R.'s PTSD. Suppl. GVO, Ex. B. at 000015, 000021.

government's calculation, in total, Victim C.R.'s out-of-pocket costs for those prescriptions totaled $508.77. *See* Suppl. GVO, Exh. C.

*Health Insurance Premiums*

At this time, based on the documentation Victim Teller C.R. has provided to date, the government does not recommend restitution for her increased health insurance premiums. According to Victim Teller C.R., while she was employed by Citibank, she paid approximately $24 per month out-of-pocket for health insurance coverage. Suppl. GVO, Ex. B at 000001. After she left work due to the trauma she experienced, her monthly health insurance premium increased to $172.14 per month. *Id.* Ex. B at 000001. As supporting documentation, Victim Teller C.R. provided one billing statement, dated September 23, 2025, which reflects that Victim Teller C.R. was billed $172.14 by Citibank for "benefits coverage." Victim Teller C.R. appears to be seeking restitution for the increase in her monthly health insurance premium, as a result of her having to leave Citibank due to the trauma suffered from the November 7, 2023 robbery.

At this time, without additional documentation that confirms (1) her health insurance premium while employed, or (2) her aggregate cost-increase for health insurance since she left Citibank's employment, the government does not believe the record supports restitution for Victim Teller C.R.'s increased health insurance premiums. If, prior to sentencing, the government obtains additional supporting documentation from Victim Teller C.R., the government will supplement the record as appropriate.

In total, the government respectfully requests that the Court impose $6,928.98 ($6,420.18 for treatment and $508.77 for medication) in restitution owed to Victim Teller C.R, in addition to the $13,811 owed to Citibank.

## V. Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose an above Guidelines sentence of 240 months' imprisonment, followed by a three-year term of supervised release, and total restitution in the amount of $20,739.29.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: */s/ Minje Shin*
Minje Shin
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 469-6024

Date: July 15, 2026